IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2019 Session

## JOHN J. HASENBEIN v. KATHERINE J. HASENBEIN

**Appeal from the Circuit Court for Montgomery County**
**No. 16-CV-1890     Ross H. Hicks, Judge**

———————————————————

### No. M2018-00070-COA-R3-CV

———————————————————

This is an appeal in a divorce proceeding, wherein the mother contends that the trial court erred in awarding the father the divorce on the ground of inappropriate marital conduct and in its holdings as to the factors at Tennessee Code Annotated section 36-6-106 in naming the father the primary residential parent. Father appeals the court's ruling on a motion he filed seeking to further specify the parents' responsibilities relative to the transportation of the children. Upon consideration of the record, we vacate that portion of the judgment that holds that factors (11) and (12) at section 36-6-106(a) are not applicable and remand the case for further consideration in that regard and, if necessary, to reconsider the designation of the primary residential parent; in all other respects we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Vacated in Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Sharon T. Massey, Clarksville, Tennessee, for the appellant, Katherine J. Hasenbein.

Kimberly G. Turner, Clarksville, Tennessee, for the appellee, John J. Hasenbein.

## OPINION

### I. Facts and Procedural History

Katherine J. Hasenbein ("Mother") and John J. Hasenbein ("Father") were married on December 20, 2000. Two children were born of this marriage: Cody, born in 2004, and Jacob, born in 2007. At all times material, Father was on active duty in the Army,

stationed at Fort Campbell, Kentucky, with the family residing in Clarksville, Tennessee. On September 7, 2016, Father filed a Complaint for Divorce, asserting the grounds of inappropriate marital conduct and irreconcilable differences. Mother filed an Answer and Counter Complaint, asserting inappropriate marital conduct as the ground and requesting that she be named primary residential parent and awarded spousal and child support, and a portion of Father's military retirement as marital property. An order was entered on October 21, staying the proceedings until Father returned from his deployment. He returned in February 2017, and a temporary parenting plan was entered on March 8, naming Mother primary residential parent, giving Father residential parenting time on alternate weekends and from 3:00 - 8:00 p.m. on Wednesdays, and setting support at $957.00 per month (later decreased by agreement to $857.00).

Trial was held on May 3 and June 1, 2017, at the end of which the court orally declared the parties divorced, established temporary support of $1,000 per month to be paid by Father, granted Father two consecutive weeks of parenting time for the summer of 2017, ordered the parties to submit proposed findings of fact and conclusions of law, and reserved all other issues pending the entry of a Final Order.[1] The court issued a Memorandum Opinion on July 25, and entered a Final Decree on August 16, awarding Father the divorce on the ground of inappropriate marital conduct and naming him primary residential parent; contemporaneously with the Final Decree, the court entered a permanent parenting plan which, *inter alia*, granted the parties equal parenting time.

Mother moved to alter or amend the judgment on September 14, asserting that the court erred in finding that she was not credible and that Father should be named the primary residential parent. Father also moved to alter or amend the judgment on September 14, asking the court to name him the sole decision maker regarding educational and extracurricular activities, and to order Mother to provide her residential address or prove she had appropriate accommodations for the children at her residence. The motions were heard on January 3, 2018, and the court entered an order on January 10 denying both motions. Mother filed a notice of appeal on January 9.[2]

On February 5, Father filed a "Motion To Allow Step-Parent To Transport", in

---

[1] The court's oral ruling was memorialized in an order entered June 7.

[2] On June 4, 2018, this court entered an order noting that the August 16, 2017, decree was not a final, appealable judgment, because both parties had filed motions to alter or amend the August 16, 2017 judgment. We ordered Mother to show cause why the appeal she had initiated on January 9 should not be dismissed for lack of a final judgment, to provide with her response a copy of any order entered in the trial court disposing of the post-judgment motions, and to request that the clerk certify and submit a supplemental record. She and Father were also ordered to address why Mother's appeal should not be consolidated with an appeal that Father had filed from an order entered on March 5, 2018, which had been assigned a new appeal number. Following her response, this court entered an order on June 21 consolidating both appeals and ordering the trial court clerk to submit a supplemental record. No issue is raised on appeal as to the finality of any order.

which he asked that his wife be allowed to "pick up the children for parenting time exchanges when the Father is unavailable to do so." The court entered an order on March 5, granting Stepmother the authority to pick up the children from school if it was Father's residential parenting time and he was home to exercise his time; the order also required Father to notify Mother of his schedule. Father filed a timely notice of appeal, and the appeals were consolidated on June 21, 2018.

On appeal Mother contends that:

1. The court abused its discretion when it declared the parties divorced and then later awarded the Father a divorce on the ground of inappropriate marital conduct; and

2. The court abused its discretion in naming the Father the primary residential parent when the evidence preponderates against such a ruling in the application of the factors as set out in Tenn. Code Ann. section 36-6-106.

Father raises the following issues for our review:

1. The trial court erred in ruling on a motion regarding the Stepmother exercising visitation with the minor children when no such motion was before the court.

2. The trial court erred by imputing a right of first refusal where no such right existed.

3. The trial court erred by modifying the parenting plan when no petition to modify was pending before the trial court.

4. The trial court erred by modifying the permanent parenting plan when there had been no testimony and no showing of a material change of circumstance.

5. The trial court erred in modifying the permanent parenting plan to require that "if Mr. Hasenbein is not in the home for the night, the children shall be returned to the Mother".

6. The trial court erred in modifying the permanent parenting plan to require "the Father shall notify the Mother of his schedule and the children shall be returned to the Mother if the Father is gone from the home".

- 3 -

## II. Standard of Review

"Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent." *Burton v. Burton*, No. E2007-02904-COA-R3-CV, 2009 WL 302301, at *2 (Tenn. Ct. App. Feb. 9, 2009). Because decisions regarding parental responsibility often hinge on subtle factors, such as the parent's demeanor and credibility during the proceedings, appellate courts are reluctant to second-guess a trial court's parenting schedule determinations. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Consequently, a trial court's decision regarding a permanent parenting plan will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). The standard of review for an asserted abuse of the court's discretion was set forth in *Lee Medical, Inc. v. Beecher*:

> An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

312 S.W.3d 515, 524 (Tenn. 2010) (internal citations omitted).

We review the trial court's factual findings *de novo* upon the record, accompanied by a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). Review of the trial court's conclusions of law is *de novo* with no presumption of correctness afforded to the trial court's decision. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006). Accordingly, we will not disturb the parenting plan fashioned by the trial court unless that decision is based on a material error of law or the evidence preponderates against it. *Adelsperger*, 970 S.W.2d at 485.

## III. Analysis

### A. Finality of the June 1, 2017 Oral Ruling

Mother first argues that, after Father filed his proposed findings of fact, the court changed its initial oral ruling, in which it declared the parties divorced, to award Father the divorce on the ground of Mother's inappropriate conduct; she contends that "the

- 4 -

written ruling does not accurately reflect the trial court's decision at the time of the taking of the proof and the only conclusion is that the oral ruling was the ruling of the court's independent judgment but was convinced otherwise after reading [Father's] findings of fact and conclusions of law." This argument is without merit.

The Tennessee Supreme Court has held, "It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders." *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015). The June 1 oral ruling only became enforceable to the extent that it was memorialized in a written order, which occurred on June 7; in neither the oral ruling nor the June 7 order did the court state the party to whom the divorce would be granted or the ground for the divorce. By its terms, the June 7 order, which simply declared the parties divorced, made several other rulings, and specifically reserved other issues for resolution, was a modifiable order and not a final judgment as contemplated by Tennessee Rule of Civil Procedure 54.01.

In the Memorandum Opinion issued July 25 and later incorporated into the Final Decree, the court noted that each party accused the other of infidelity and proceeded to discuss the evidence relative to the issue; the court noted that Father introduced text messages, Facebook posts, and emails "indicating that the Wife was involved in a romantic relationship with [her paramour]." The court also considered Mother's testimony, in which she initially denied committing any infidelity and later admitted to having an "inappropriate relationship" with her paramour; this inconsistency in her testimony, along with the testimony of her paramour's ex-wife, caused the court to hold that Mother's testimony on this subject was not credible. The court also noted that "[w]ith the one exception of the admitted affair that the Husband had during a separation, the Wife did not introduce any evidence supporting her contentions of Husband's infidelity." The Final Decree, entered after the parties had filed their proposed findings and conclusions, awarded Father the divorce on the ground of inappropriate marital conduct.

Upon our review of the record, there is no indication that the ruling was not a product of the court's independent judgment. Mother has not cited to any evidence from which to conclude that the court abused its discretion when it asked the parties to submit proposed findings and conclusions prior to declaring the ground for the divorce, and in awarding the divorce to Father on the ground stated. Moreover, with respect to the issue of the parties' infidelity, the court held "[a]lthough Wife denied any other romantic relationships, the Court does not find her testimony on this subject to be credible."[3]

---

[3] "Whether one party or another should be awarded a divorce on grounds of inappropriate marital conduct is often determined by a trial court's credibility assessment." *Chaffin v. Ellis*, 211 S.W.3d 264, 289 (Tenn. Ct. App. 2006).

**B. Designation of Primary Residential Parent**

Mother next contends that the trial court abused its discretion in naming Father the primary residential parent and in applying Tennessee Code Annotated section 36-6-106(a) (2017). In *Chaffin v. Ellis,* this court discussed the standard to be used by the trial court in designating the primary residential parent:

> In choosing which parent to designate as the primary residential parent for the child, the court must conduct a "comparative fitness" analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other. In engaging in this analysis, the court must consider the factors set out in Tennessee Code Annotated § 36-6-106(a). Trial courts have broad discretion in making custody determinations, but those determinations must be based on the proof at trial and the applicable principles of law. The decision frequently hinges on the credibility of the witnesses at trial, a matter that is within the sound discretion of the trial court; consequently, appellate courts are loathe to second-guess a trial court's conclusion.

211 S.W.3d 264, 286-287 (Tenn. Ct. App. 2006) (internal citations omitted). Determinations under section 36-6-106 "should always be made upon the best interest of the child, and in accordance with the factors." *Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (quoting *Hopkins v. Hopkins*, No. M2002-02233-COA-R3-CV, 2003 WL 21462971, at *4 (Tenn. Ct. App. June 25, 2003)). We review the trial court's decision, including the court's assignment of weight to any given factor under the abuse of discretion standard and will not reverse a determination unless the court has caused an injustice to a party by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc.*, 312 S.W.3d at 524.

In the Memorandum Opinion, the court addressed the factors at section 36-6-106(a)[4] and held that factors (1), (5), and (13) favored Mother; factors (2), (8), and (10)

---

[4] Tenn. Code Ann. section 36-6-106(a) states, in relevant part:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities

favored Father; factors (4), (6), (7), (9), and (14) were equal; and factors (3), (11) and (12) were not applicable.[5] We address the court's holdings as to the factors in the order

relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

[5] Neither party contests the trial court's holdings relative to factors (3), (4), (7), (9), and (14).

presented by Mother.

### 1. *Factors (1) and (5)*

Mother does not contest the holdings that factors (1) and (5) are in her favor; in reliance on Father's testimony that he had been deployed for up to six months at a time, she argues that the court failed accord more weight to the fact that she had been the sole caregiver for most of the children's lives. In its findings, the court acknowledged that Mother has been the "primary and exclusive caregiver" for most of the parties' marriage; thus, the court acknowledged Mother's role in that regard. While Mother argues that this factor should have been granted more weight, she does not cite to any evidence, and upon our review we have not discerned any, from which we could conclude that the court abused its discretion in the weight it chose to assign these factors.

### 2. *Factors (2), (8) and (10)*

The court based its holding that factor (2) favored Father on "Mother's failure to follow the orders of the court during this proceeding and her inappropriate discussions of these proceedings with the children." Mother first argues that the court misapplied the legal standard because factor (2) is "specific to visitation arrangements and a parent's willingness to encourage children to visit and not cause undue problems during visitation" by withholding visitation in violation of a court order. We do not agree. Contrary to Mother's characterization, factor (2) is not limited to visitation arrangements; it also requires the court to "consider the likelihood of each parent . . . to honor and facilitate court ordered parenting arrangements and rights." Tenn. Code Ann. section 36-6-106(a)(2). A consideration of the extent to which a parent has complied with pertinent court orders is not inconsistent with determining whether a parent has facilitated visitation.

Citing to Father's testimony that he was "able to get the children during his allotted time," Mother also argues that the evidence demonstrates that she never interfered with Father's visitation. Father also testified, however, that "[Mother] has made it very difficult to get [his] kids and causes problems . . . where cops had to be called before . . . that pickup process." Considered in context, the testimony cited by Mother does not preponderate against the holding that Mother's conduct interfered with Father's ability to exercise his parenting time.

Mother argues that the finding that she violated the order prohibiting the parties from discussing the case with the children is not supported by the record.[6] Mother

---

[6] At the inception of the case, the parties were bound to comply with the injunction codified at Tennessee Code Annotated section 36-4-106(d) (2017), which states, in pertinent part:

testified on direct examination that she had not discussed with the children the abuse she alleged that she suffered at the hands of Father. On cross examination, Mother testified that she discussed the latest of the two suicide attempts with the children and explained to them that her behavior was "the Father's fault"; the court found that "Mother admitted that she told Cody, the parties' oldest son, that she behaved the way she did because the Father was abusing her." Mother's testimony, taken in its entirety, supports the holding that she violated the court order.

We conclude that the court correctly applied the legal standard as outlined in factor (2) and that the holding is supported by the record.

The holding that factor (8) favored Father was based on testimony regarding Mother's two suicide attempts and other incidents in which she exhibited what the court deemed "irrational behavior." Mother contends that the court misapplied factor (8) by "fail[ing] to evaluate the moral, physical, mental or emotional fitness of each parent as it relates to each parent's ability to parent the children," and that "the court's reasoning is against the evidence presented at trial" because there were no suicide attempts.

Contrary to Mother's first argument, the court found that "there is no question that both Father and Mother . . . are physically and mentally fit to parent but there is question concerning Mother's emotional stability." The court's concern, as stated in the findings, stemmed from the fact that "Mother has attempted suicide on two separate occasions" and that "there was other testimony that indicated that Mother is sometimes irrational in her behavior with respect to incidents that have occurred on the ball field and related to transportation of the children to events."

While Mother acknowledges in her brief that she made remarks on two occasions that "the children would be better off if she were gone," she contends that those remarks do not support the court's findings; the testimony about those incidents, however, puts

---

Upon the filing of a petition for divorce or legal separation, and upon personal service of the complaint and summons on the respondent or upon waiver and acceptance of service by the respondent, the following temporary injunctions shall be in effect against both parties until the final decree of divorce or order of legal separation is entered . . . written notice of which shall be served with the complaint:

(3) An injunction restraining both parties . . . from making disparaging remarks about the other to or in the presence of any children of the parties or to either party's employer.

In addition, the court entered an order on March 8, 2017 stating, *inter alia*, "neither party shall discuss issues regarding the divorce with the children."

her remarks into context and supports the court's findings. With respect to the first incident, Father testified that Mother attempted to physically harm herself in the presence of the children; in lieu of seeking medical treatment at a hospital, the matter was handled "in house." Father testified that the second incident involved a physical altercation between he and Mother "in which she was pulling her hair out, slamming her head into the wall, trying to kick out the windows, . . . she had my pistol," causing the children to hit the panic button on the alarm system, resulting in the police coming and Mother being taken to a hospital. When asked about this incident in the course of her cross examination, Mother acknowledged that she was treated at the hospital, determined "not [to be] suicidal any more," and released.

Although it is not disputed that Mother continued to act as primary caregiver for the children after these incidents, the court was required to consider evidence that bears on the mental, physical and emotional fitness of the parents; the circumstances of these incidents demonstrate that Mother had periods of instability. While Mother argues that these incidents were due "to the acts of Father," the court could not ignore them as part of its analysis; indeed, the court recognized that Mother was mentally fit to parent the children. We are not persuaded that the court erred in weighing factor (8) in favor of Father.

The court held that factor (10) favored Father because he would remain in the marital residence; specifically, the court found that "if [Father] is designated primary residential parent . . . the children will be able to remain in the same school system, the same neighborhood, sleep in the same bedrooms and be with the same friends," and that "if Mother is designated primary residential parent, the oldest child, Cody, who already has some behavioral issues, will be required to change schools." Citing the provision in the parenting plan that provided that the children would "remain in Clarksville with the Mother and the Father shall exercise parenting time every third weekend of the month," Mother argues that she would provide the most continuity in the children's lives; she also argues that the court should have found factor (10) in her favor due to the fact that she had been the primary and exclusive caregiver for most of the marriage. Mother does not cite to any evidence that preponderates against the court's holding.

Mother's argument is based on the fact that she was the primary caregiver for the children, as the court acknowledged in holding that factor (1) weighed in her favor. The holding with respect to factor (10), however, is focused on maintaining the stability that the children enjoy in their current school and home environments in preference to the disruption caused if they had to move. This is the focus called for by factor (10), and the court's determination is supported by the evidence.

   3. *Factors (6), (11). (12) and (13)*

Mother asserts that the court should have determined factors (6), (11), (12), and

(13), which the court held to be equal or inapplicable, to be in her favor. We discuss each factor in turn.

The court held that factor (6) favored the parties equally because "both parents appear to [love] the children and have an appropriate relationship with them." In reliance on Cody's testimony that he wants to live with her, Mother asserts that this factor "weighs heavily in favor of [her]." While Cody's preference to live with Mother is evidence of his relationship with Mother, it is not inconsistent with the court's holding. Again, we have not been cited to, or discerned on our review, any evidence from which we could conclude that the court abused its discretion in the weight it chose to assign the evidence.

With respect to factor (11), in the Memorandum Opinion the court noted that Mother "testified that she had constantly been abused both physically and emotionally by [Father] and that her emotional breakdowns, including two apparent suicide attempts, were as a result of [Father's] abuse." In holding that factor (11) was inapplicable, however, the court did not refer to this testimony or that of their son who testified that he "saw [Father] hit [his] mom over and over again", that Father hit Mother with a glass beer bottle "and it left a bruise across her face", and that he witnessed the Father "pour beer on [Father's current wife]." In the course of his examination, Father testified that "[the children] have seen me hold her down when she is flipping out, but not assault her and attack her." We conclude that this factor is applicable because the testimony of both parties is potential "evidence of physical or emotional abuse . . . to the other parent," within the meaning of the statute.

Mother also asserts that the court erred in failing to consider Father's infidelity in its determination of factor (11). However, the statute only requires the court to consider "evidence of physical or emotional abuse to the child or the other parent." Mother's argument in this regard is without merit.[7]

Factor (12), which the court held was inapplicable, requires the court to consider the character of any person who resides in or frequents the home of the parent and children. Mother contends that the court should have held the factor in her favor because "Father was living with his [current wife] at the time of the final hearing." Father argues that the holding was correct because the court did not give a negative inference to that testimony or to testimony that Mother allowed the children to spend time with her paramour.[8] The evidence of Mother's and Father's relationships is pertinent to the

---

[7] We also note the court's holding that "Wife did not introduce any evidence supporting her contentions of Husband's infidelity."

[8] Father testified that Mother's paramour had been arrested for domestic violence.

- 11 -

consideration called for in factor (12), particularly in light of the testimony that Mother's paramour and Father's then-girlfriend frequently interact with the children.

Based on Cody's testimony that he preferred to live with Mother, the trial court held that factor (13) favored Mother; the court noted, however, that "while this expressed preference would ordinarily strongly favor the Mother, it was obvious that Cody's testimony was greatly influenced by [the Mother.]"[9] Citing other testimony of Cody, which she contends shows that he "was not a child who could be easily influenced," Mother contends that the court should have accorded more weight to Cody's preference to live with her. As noted earlier, the weight to be given the evidence is a matter left to the sound discretion of the trial court; however significant the difference between "favoring" and "greatly favoring" Mother may be, we have not been cited to evidence that demonstrates that the court abused its discretion in giving Cody's testimony the weight it did.

Upon our review, we have determined that the trial court's holdings as to factors (1), (2), (5), (6), (8), (10), and (13) are supported by the record, and the court did not abuse its discretion in the weight assigned to each; accordingly, we affirm the judgment as to those factors. We have also determined that there was evidence pertinent to factors (11) and (12), which was not considered by the trial court; we vacate that portion of the judgment and remand the case for the court to make such findings and holdings relative to those factors as may be appropriate based on the evidence and, if necessary, reconsider the designation of primary residential parent.[10]

### C. Order on Father's Motion to Allow Step-Parent to Transport

As noted earlier, after the final order was entered, Father filed a motion asking that his wife be allowed to "pick up the children for parenting time exchanges when the Father is unavailable to do so." The court granted the motion on March 5, 2018 ("the March 5 order"), stating:

---

[9] Related to this holding, in another portion of the opinion, the court noted:

[Cody] also made statements which would indicate to the court that he has been improperly influenced by his Mother with respect to his beliefs concerning the relationship between his Father and Mother. The court finds that much of Cody's testimony demonstrates his attempt to protect his Mother and put her in a favorable light. For this reason, the Court discounts much of Cody's testimony regarding specific events."

[10] The testimony cited by Mother and Father in their discussions of factors (11) and (12) consists of conflicting testimony as to Father's alleged abuse of Mother, and testimony of Mother and Father related to each other's paramour/new wife.

1. The Father has orders from the United States Army and will be away from the home as stated in his previous motion filed with this Court. He will be unable to exercise his visitation and has requested that his wife exercise his time with the children. The Court finds that the Step Mother cannot exercise the Father's time as that will involve testimony and for the Court to determine if that is in the best interest if the children. At this time, the Step Mother is not awarded the Father's visitation.

2. The Court will allow the Step Mother to transport, however, if Mr. Hasenbein is not in the home for the night, the children shall be returned to the Mother.

3. The Father shall notify the Mother of his schedule and the children shall be returned to the Mother if the Father is gone from the home.

4. There are no other motions before the Court and the Court will not rule on any other motions until the parties attend mediation.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED the Step Mother is not granted the Father's residential time at this time. The Step Mother may pick the children up from school, if it is the Father's time and he is home to exercise his time with the children. The parties must return to mediation before any further Motions will be heard. The Father shall communicate with the Mother regarding his schedule.

Following entry of the order, Father filed a motion for reconsideration, asking the court to clarify certain portions of the order that "were poorly worded and [did] not reflect accurately what was ordered by the Court." Succinctly, Father was concerned that the order might be interpreted to apply at times other than when he was on a special duty assignment. The court overruled the motion. Father contends that the court erred and that, in not specifying that the requirements would only be applicable during those times he was on a special duty mission, the requirements amount to a modification of the parenting plan.

In the March 5 order, the court acknowledged that Father had received orders from the Army that required him to be away from home; the court allowed Stepmother to transport the children during Father's residential parenting time if he was home and ordered that Father communicate with Mother regarding his schedule. Viewed in its entirety and in the context of the week-on, week-off residential parenting plan, the order recognized that, if Father was out of town on assignment, he would not exercise his parenting time; the order was not a modification of the parenting plan but, rather, an accommodation of the parties' circumstances. In this regard, we note that, in her brief on appeal, Mother acknowledges that it "is not a permanent change and only applies when

- 13 -

the Father is deployed."  Father's argument is without merit.

## IV. Conclusion

For the foregoing reasons, we vacate that portion of the judgment that holds that factors (11) and (12) at Tennessee Code Annotated section 36-6-106(a) are not applicable and remand the case for further consideration in that regard and, if necessary, to reconsider the designation of the primary residential parent; in all other respects we affirm the trial court's judgment.

RICHARD H. DINKINS, JUDGE